IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

JOANN BRYANT,  *

    Plaintiff,  *

vs.  *

                              CASE NO. 4:18-CV-106 (CDL)

CRYSTAL GAIL GARREN, *et al.*,  *

    Defendants.  *

O R D E R

Larry Wayne Burden, Jr. was an inmate at the Harris County Prison. On November 5, 2015, Burden collapsed while playing basketball in the prison yard. Tragically, he died soon afterwards. His mother brought this wrongful death action, alleging that the corrections officers on duty did not provide adequate aid to Burden after they learned he collapsed.[1] Plaintiff asserts her claims pursuant to 42 U.S.C. § 1983, alleging that the corrections officers deprived Burden of his rights guaranteed by the Eighth Amendment to the U.S. Constitution. Plaintiff also claims that the Georgia Department of Corrections and Harris County are liable for any constitutional violations committed by the corrections officers. And, she asserts various state law claims. Defendants filed summary judgment motions, and Plaintiff filed a motion to set

---

[1] Plaintiff also claimed that an unidentified prison guard used excessive force on Burden earlier in the day. She abandoned that claim, so Defendants are entitled to summary judgment on it.

aside the Court's previous order dismissing her claims against Harris County. As discussed below, Plaintiff did not present evidence that would permit a jury to conclude that the corrections officers violated Burden's constitutional rights or that any constitutional violation caused Burden's death. The Court thus grants Defendants' summary judgment motions (ECF Nos. 33 & 34) and denies Plaintiff's motion to set aside the order dismissing her claims against Harris County (ECF No. 59).

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

## FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff, the record reveals the following facts.

Burden was a state inmate housed at the Harris County Correctional Institution (the "Prison"), a minimum-security prison. The Prison is owned and operated by Harris County. Harris County houses up to 150 state inmates in the Prison for a fee pursuant to an agreement with the Georgia Department of Corrections ("GDOC"). Plaintiff admits that Prison employees are hired by Harris County and are paid by Harris County.

On November 1, 2015, Burden, who was twenty-four years old, complained to Corrections Officer Donald Barber of chest pain on his right side. Garren Dep. Ex. 37, Incident Report (Nov. 1, 2015), ECF No. 45 at 165. Burden stated that he thought it was because he drank so much coffee, and he asked for a medical request form. *Id.* Barber reported the issue to his supervisor, Crystal Garren, who told Barber to keep a close eye on Burden and have him fill out a medical request form. *Id.* Barber checked on Burden again, and Burden said it was a slight pain that "comes and goes." *Id.* Barber advised Burden to fill out the medical request form and let officers know if the pain got any worse. *Id.* There is no evidence that any corrections officers except Barber and Garren knew that Burden had reported chest pain. And, Plaintiff pointed to evidence that on November 3, 2015 Burden saw a medical provider who doubted that Burden's symptoms were heart related and prescribed Tylenol and Omeprazole, a medication for

gastroesophageal reflux symptoms. Walker Dep. Ex. 9, Physician's Notes, ECF No. 47 at 258.

On November 5, 2015, Crystal Garren, Daniel Maddox, Donald Walker, Jeremy McDowell, Noel Flowers, and Troy Moore ("Corrections Officer Defendants") were on duty as corrections officers at the Prison.[2] There were no medical personnel at the Prison that day. Burden and other inmates from his cell dorm had a recreation period in the Prison recreation yard, an open-air yard within the interior of the prison. Burden played basketball with another inmate. He collapsed. No corrections officers were physically present in the recreation yard when Burden collapsed. At approximately 11:37 a.m., Maddox was taking lunch bags and juice to inmates in the yard. He "then observed" Burden lying on the ground.[3] Walker Dep. Ex. 10, Incident Report (Nov. 5, 2015), ECF No. 47 at 259. Maddox rushed to Burden. Maddox Dep. 49:20-50:2, ECF No. 46 (stating that it took him about fifteen seconds to get to Burden). Moore, who was stationed in the Prison's

---

[2] Barber was not on duty and not at the Prison on November 5, 2015. Plaintiff did not point to any evidence that Barber was subjectively aware that Burden had a serious medical need or that Barber was deliberately indifferent to such a need. Accordingly, Barber is entitled to summary judgment.

[3] Defendants pointed to surveillance footage from which a jury could conclude that Burden was still on his feet playing basketball at 11:39:04. Nelson Decl. Ex. 1, M2U00388 00:01, ECF No. 35; Barber Dep. 62:1-16, ECF No. 48 (viewing video and stating that Burden is the player with the ball at 11:39); Walker Dep. 152:11-20, ECF No. 47 (viewing video and stating that Burden is still up at 11:39). But the Court must view the evidence in the light most favorable to Plaintiff, and a jury could conclude based on the incident report that Maddox saw Burden on the ground at or shortly after 11:37 a.m. and that the time stamp on the surveillance footage was slightly off.

4

control room with Walker, noticed that several inmates were banging on a window between the yard and a hallway outside the control room. Moore went to the yard and saw Burden on the ground. He thought that Burden might have been knocked out while playing basketball; he saw that Burden was breathing and that his eyes were open, then shook him and asked him if he was okay. Moore Dep. 68:3-69:3, ECF No. 55.

Moore started moving inmates off the yard while Maddox attended to Burden. Burden did not respond to Maddox's questions, but he was still breathing. Maddox Dep. 50:10-23. At approximately 11:39 a.m., Maddox called for his supervisor, Garren, over the radio. He also asked for 911 to be called. Plaintiff admits that someone at the Prison called Harris County 911 at 11:41 a.m. and that emergency medical personnel were dispatched to the Prison at 11:42 a.m. Pl.'s Resp. to Corrections Officer Defs.' Statement of Material Facts ¶¶ 27-28, ECF No. 58-2. Confusingly, though, Plaintiff also asserts that 911 was not called until 11:44 a.m. Pl.'s Resp. to Corrections Officer Defs.' Mot. for Summ. J. 3, ECF No. 58; Pl.'s Statement of Material Facts in Resp. to Corrections Officer Defs.' Mot. for Summ. J. ¶ 24, ECF No. 58-1 (pointing to the incident report, which states that Maddox was taking lunch to the inmates on the yard at "approximately 1137 hours," that Maddox "then observed" Burden on the ground and called for help, that CPR began at

5

"approximately 1142 hours," and that 911 was called "at approximately 1144 hours").

Garren, Flowers, McDowell, and prison counselor Barbara Whittaker ran to the recreation yard as soon as Garren got Maddox's call. Garren and Whittaker helped Maddox assess Burden for injuries, McDowell helped clear inmates from the yard, and Flowers retrieved a handheld video camera to record the incident pursuant to Prison protocol. Walker, who was still manning the control room, notified the other officers that he had combat life-saving training from his time in the Army, so McDowell went to the control room and Walker rushed to the yard. The officers observed scrapes on Burden's face and believed that Burden may have hit his head on the ground when he collapsed. Burden was still breathing, although his breaths became gasps with fifteen seconds or more between them. Then, at approximately 11:42 a.m., when they realized that Burden had not taken a breath in about a minute, Walker and Whittaker began attempting to perform cardiopulmonary resuscitation (CPR), including chest compressions and mouth-to-mouth. Plaintiff asserts that Whittaker did not perform the chest compressions correctly.

Plaintiff argues that corrections officers "accused" Burden of faking a serious medical condition, that the officers delayed CPR until five minutes after Burden stopped breathing, and that the officers' "motivation in delaying CPR" was because "Burden

6

could have been faking his unresponsiveness." Pl.'s Statement of Facts in Resp. to GDOC Mot. for Summ. J. ¶¶ 4, 8-9, ECF No. 56-3; Pl.'s Statement of Facts in Resp. to Corrections Officer Defs.' Mot. for Summ. J. ¶ 14. The record does not support this argument. First, the testimony Plaintiff cited for her argument that the officers accused Burden of faking his unresponsiveness and therefore delayed treatment does not support it. Rather, the officer was asked a question that assumed it took five minutes for officers to assess the situation and begin CPR, and he responded, "[W]e were still figuring out what happened. We didn't know if he was faking it. We didn't know if he got punched. We didn't know if he had ran into the basketball hoop. Nobody knew what happened. We were still assessing the area. We had people all over the yard. We was getting people off the yard." Flowers Dep. 88:10-19, ECF No. 52. Second, and more importantly, the record simply does not support Plaintiff's assertion that Burden stopped breathing a minute after officers arrived to assess him, but that five minutes went by before any of the officers began attempting CPR. The evidence Plaintiffs cited—page 107 of Walker's deposition—does not support this assertion. The evidence does suggest that Burden collapsed at 11:37 a.m. and that chest compressions started five minutes later. Walker Dep. 106:24-107:21. But it does not establish that Burden stopped breathing five minutes before officers attempted to resuscitate

7

him, and Plaintiff did not point to any other evidence to support this assertion. As discussed above, Burden was still breathing when officers responded to him, and Plaintiff admits that fact. Pl.'s Resp. to Corrections Officer Defs.' Statement of Material Facts ¶ 22 (admitting that Burden was "taking deep breaths and his eyes were open"). Plaintiff also pointed to evidence that Burden began "taking in very slow gasps of air" and that corrections officers began CPR when they realized that Burden had not taken a breath in about a minute. Incident Report (Nov. 5, 2015), ECF No. 47 at 259. In summary, the record does not support Plaintiff's assertion that the officers intentionally delayed CPR until five minutes after Burden stopped breathing.

Emergency medical personnel arrived between 11:45 a.m. and 11:49 a.m. and took over the response, and they departed with Burden via ambulance between 11:51 a.m. and 11:55 a.m. Burden was pronounced dead at the hospital at 12:29 p.m. The cause of death was later determined to be cardiac dysrhythmia (irregular heartbeat) with cardiomegaly (enlarged heart) and myocardial fibrosis (impairment of heart muscle cells).

The Prison had an automated external defibrillator ("AED") in the control room, but no policy or directive on when to use it. Haden Dep. 212:25-213:14, ECF No. 44. All the officers on duty except Moore, who was a cadet in training at the time of Burden's death, had received training on how to use the AED.

McDowell Dep. 50:19-20, ECF No. 49; Moore Dep. 17:23-18:11. Under GDOC's standard operating procedures that apply to county prisons, the initial response of corrections officers "to urgent or emergent medical requests may include First Aid, CPR, defibrillation with an Automated External Defibrillator (AED) when indicated, and immediate notification of health care personnel." Lewis Dep. Ex. 2, GDOC Standard Operating Procedure VH31-0005 ¶ VI.A.2, ECF No. 53 at 200. If no healthcare personnel are on site and corrections officers respond to a potentially life threatening medical emergency, they "should" take a "medical response bag, portable oxygen, AED, and a stretcher" to the location. *Id.* ¶ VI.B.2, ECF No. 53 at 201-02; Lewis Dep. 67:16-20, ECF No. 53. Moreover, according to GDOC's in-service training witness, GDOC officers are trained that if a person stops breathing and does not respond when the officer taps him, then the officer should immediately call for someone to get an AED. Raffield Dep. 29:19-30:19, ECF No. 43. None of the corrections officers on duty at the Prison on November 5, 2015 thought to retrieve the AED for use on Burden. And, the Prison's AED was inoperable on November 5, 2015 because its batteries were dead. Walker Dep. 71:4-13.

DISCUSSION

Plaintiff brought federal claims under 42 U.S.C. § 1983, asserting that Defendants violated Burden's Eighth Amendment

right to be free from cruel and unusual punishments.[4] The Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners" because it "constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "To establish a constitutional deliberate-indifference claim, [Plaintiff] must demonstrate '(1) [that Burden had] a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and [Burden's] injury.'" *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (quoting *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009)).

There is no dispute that Burden had a serious medical need when he collapsed and became unresponsive. To establish that the Corrections Officer Defendants acted with deliberate indifference, Plaintiff "must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (alteration in original) (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th

---

[4] Plaintiff also invokes the Fourteenth Amendment. Burden was a convicted prisoner, so the Eighth Amendment's cruel and unusual punishments clause applies. The Court presumes that Plaintiff invokes the Fourteenth Amendment because the Eighth Amendment's cruel and unusual punishments clause applies to the states through the Fourteenth Amendment's due process clause. *See Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam). Plaintiff does not appear to assert an independent Fourteenth Amendment claim.

Cir. 2005) (per curiam), *abrogated on other grounds by Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2477 (2015)).  A prison guard may be deliberately indifferent to a serious medical need if he knows that an inmate has stopped breathing but fails "for fourteen minutes to check [the inmate's] condition, call for medical assistance, administer CPR or do anything else to help." *Bozeman*, 422 F.3d at 1273.  Liability can also attach when a prison official takes no action despite knowing that an inmate reported being "all busted up" from a car wreck—even after hearing the inmate cry out in pain for several hours.  *Taylor*, 920 F.3d at 734.  And, a prison official may be deliberately indifferent if he intentionally delays medical treatment despite having reason to know that the delay could worsen the inmate's condition.  *Goebert*, 510 F.3d at 1329 (jail commander was deliberately indifferent when he intentionally delayed for one day, with "no good reason," authorizing medical care for an inmate with a serious medical need that was getting progressively worse); *accord Alsobrook v. Alvarado*, 477 F. App'x 710, 713 (11th Cir. 2012) (per curiam) (corrections officer was deliberately indifferent because he refused to transport an inmate to medical care for almost two hours even though the inmate was continuously bleeding from a gash to his head).

Here, the Corrections Officer Defendants did not refuse to seek medical treatment for Burden.  When Maddox found Burden

11

unresponsive but breathing, he immediately called his supervisor for help. The supervisor and other officers ran to the recreation yard. Walker told the other officers that he could help because of his combat training, so he went to the yard to help while McDowell took over for him in the control room. Flowers followed Prison policy and got a camcorder to record the response. When they realized that Burden had not taken a breath in about a minute, Walker and Whittaker began attempting CPR on Burden and continued until the paramedics arrived, though Whittaker's hand placement for the chest compressions was wrong. Either four or seven minutes after Burden collapsed (one minute before or two minutes after officers began attempting CPR), Harris County 911 was called.

Plaintiff does not appear to assert that any of these responses evinces a deliberate indifference to Burden's serious medical need. Rather, her argument focuses on the Corrections Officer Defendants' failure to use an AED on Burden. According to Plaintiff, Walker should have asked someone to retrieve the AED while he was attempting CPR; McDowell should have summoned someone to the control room to get the AED; and Flowers, Garren, and Maddox should have gone to get the AED.[5] Certainly, the

---

[5] Plaintiff also argues that Moore should have gotten the AED. But she did not rebut Defendants' evidence that Moore, who was a cadet, had not been trained on the AED and did not know that the Prison had one. Thus, his failure to bring the AED to the yard could not be deliberate indifference, and he is entitled to summary judgment.

12

failure to use the AED by all five corrections officers who had been trained to use it could be evidence of their negligence, and the failure of the Prison to adequately maintain the AED batteries could likewise be evidence of negligence. But even viewed in the light most favorable to Plaintiff, the record establishes that the officers summoned 911 shortly after Burden collapsed and that jail personnel attempted to perform CPR on Burden from the time they realized he had stopped breathing until the paramedics arrived and took over attempting to resuscitate Burden. They were not consciously indifferent to the situation.

Negligent medical care does not violate the Constitution. "In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (quoting *Estelle*, 429 U.S. at 106-07). In *Mann*, for example, the deputies "may have made an error in judgment" but were not deliberately indifferent when they took an arrestee experiencing "excited delirium" to the jail instead of to the hospital. *Id.* at 1307-08. And, they "took appropriate action" of applying cold compresses to cool down the arrestee, who they thought was suffering from a heat stroke, and ultimately calling 911 about nineteen minutes after the arrestee became unresponsive with labored breathing. *Id.* at 1301, 1308.

Similarly, here, corrections officers called 911 shortly after Burden collapsed, and officers attempted CPR on Burden from the time they realized he had stopped breathing until the paramedics arrived. This is not a case where prison officials ignored a serious medical need or intentionally delayed medical care. The Court finds that Plaintiff has not met her burden of pointing to evidence suggesting that the corrections officers disregarded Burden's risk by conduct that is more than gross negligence.[6]

Even if a genuine factual dispute existed regarding the corrections officers' deliberate indifference to Burden's serious medical need, Plaintiff failed to point to evidence from which a reasonable jury could conclude that such indifference proximately caused Burden's death.[7] "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *McDaniels v. Lee*, 405 F. App'x 456, 458–59 (11th Cir. 2010) (per curiam) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d

---

[6] The Corrections Officer Defendants are entitled to qualified immunity because Plaintiff did not present enough evidence to establish a constitutional violation. Even if there were such evidence, these Defendants would still be entitled to qualified immunity because Plaintiff did not point to any authority clearly establishing that the failure to use an AED would amount to deliberate indifference under the circumstances presented here, where officers promptly called for emergency medical personnel and attempted to perform CPR.

[7] Plaintiff does not argue that she could not present evidence on causation based on the limited discovery the Court permitted so that Plaintiff could find out what happened to Burden. Rather, she argues that the present record contains substantial evidence of causation.

14

1176, 1188 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n.9 (2002)).

Plaintiff argues that she presented "substantial evidence" that the failure to use an AED was the proximate cause of Burden's death. Pl.'s Resp. to Corrections Officer Defs.' Mot. for Summ. J. 14-15. She did not. Plaintiff pointed out that GDOC's medical director agreed that CPR, which keeps blood pumping when the heart stops, would not get the heart started again but an AED may. Lewis Dep. 60:13-19. But Plaintiff did not point to any medical evidence on how Burden's heart conditions would have responded to an AED or to any medical evidence that proper and timely use of an AED would have made a difference to Burden. Rather, Plaintiff cited the testimony of Walker, a corrections officer, and Warden Alex Haden, who generally agreed that they understood an AED can be effective to treat cardiac events. Even if their testimony could be viewed as medical causation evidence, Plaintiff did not point to any evidence that Walker and Haden were qualified to offer medical opinions. Plaintiff also submitted an American Heart Association pamphlet which states that an AED can stop "ventricular fibrillation by using an electrical shock" and that if a person experiences ventricular fibrillation, his "chance of survival decreases by 7 to 10 percent for every minute that passes without defibrillation." Pl.'s Resp. to GDOC's Mot. for Summ. J. Ex. 1,

15

Pamphlet, ECF No. 56-1 at 4. But Plaintiff did not point to evidence that Burden suffered from ventricular fibrillation or that his condition likely would have responded to an AED. Without some medical evidence that Burden's cardiac event could have been treated successfully with an AED, the Court cannot speculate that a defibrillator would have made a difference simply because Burden's death was related to several issues with his heart.[8]

In summary, Plaintiff did not point to evidence from which a reasonable jury could conclude that the Corrections Officer Defendants were deliberately indifferent to a serious medical need or that any deliberate indifference by the Corrections Officer Defendants caused Burden's death. Accordingly, Plaintiff has not created a genuine factual dispute on these issues. The

---

[8] Plaintiff argues that causation "can be shown by personal participation in the constitutional violation." Pl.'s Resp. to Corrections Officer Defs.' Mot. for Summ. J. 14 (quoting *Goebert*, 510 F.3d at 1327). The causation question at issue in the portion of *Goebert* that Plaintiff cites is whether a jail commander who delayed a plaintiff's obstetrical treatment had a causal connection to the plaintiff's harm—the stillbirth of her baby. There was a fact question on the issue because the evidence viewed in the light most favorable to the plaintiff showed that the jail commander knew that the plaintiff had a serious medical need (leaking amniotic fluid for days) but decided to withhold medical care, resulting in a one-day delay of proper obstetrical care. There was medical evidence that the commander's delay foreclosed several treatment options, and there was medical evidence that if the plaintiff had received appropriate obstetrical care sooner, the baby's chance of survival would have been significantly higher. *Id.* at 1319, 1329. Thus, there was a fact question on whether the jail commander's deliberate indifference caused the loss of the plaintiff's child. *Id.* at 1329. Here, in contrast, there is no medical evidence that Burden's medical conditions would have responded to an AED or that he would have had a significantly better chance of survival if an AED has been used.

Corrections Officer Defendants are therefore entitled to summary judgment.

All of Plaintiff's claims against GDOC are based on GDOC's alleged failure to supervise and train the Corrections Officer Defendants. In the absence of a constitutional violation, the supervisory liability claim against GDOC cannot succeed, even if the Court were to accept Plaintiff's argument that the county Prison employees were also employed by GDOC. *Paez v. Mulvey*, 915 F.3d 1276, 1291 (11th Cir. 2019) ("[T]here can be no supervisory liability . . . if there was no underlying constitutional violation." (second alteration in original) (quoting *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008))). For similar reasons, Plaintiff's municipal liability claim against Harris County likewise fails.[9] *See, e.g., Miller v. Harget*, 458 F.3d 1251, 1261 (11th Cir. 2006) (finding no basis for holding a city liable under § 1983 without an underlying constitutional violation by a city employee).

## CONCLUSION

Burden's death was tragic. The possibility that it may could have been prevented compounds the heartbreak. Moreover,

---

[9] The Court previously dismissed Plaintiff's claim against Harris County because Plaintiff did not adequately allege a Harris County policy or custom was the moving force behind a constitutional violation that injured Burden. *Bryant v. Harris Cty.*, No. 4:18-CV-106 (CDL), 2018 WL 5316359, at *7 (M.D. Ga. Oct. 26, 2018). Plaintiff moved to set aside that order, arguing that Burden's death was the result of a Harris County policy, but the claim against Harris County fails without an underlying constitutional violation.

17

evidence of possible negligence increases the desire to hold someone accountable. But the narrow issue regarding Plaintiff's federal claims is whether a *constitutional violation* by the Defendants caused Burden's death; and as explained previously, the answer to that question is clear. Accordingly, Defendants' summary judgment motions (ECF Nos. 33 & 34) are granted as to all of Plaintiff's § 1983 claims. Those are the only claims over which the Court has original jurisdiction. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, and those claims are remanded to the Superior Court of Harris County. *See* 28 U.S.C. § 1367(c). Plaintiff's motion to set aside the Court's order granting Harris County's motion to dismiss (ECF No. 59) is denied.

IT IS SO ORDERED, this 5th day of February, 2020.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA